Cite as 2021 Ark. 49

# SUPREME COURT OF ARKANSAS

No. CV-19-363

|  |  |
|---|---|
| WILLIAM B. CHERRY<br><br>APPELLANT/CROSS-APPELLEE<br><br>V.<br><br>RHONDA MARLENE CHERRY (NOW FULKROAD)<br><br>APPELLEE/CROSS-APPELLANT | Opinion Delivered: March 4, 2021<br><br>APPEAL FROM THE COLUMBIA COUNTY CIRCUIT COURT [NO. 14DR-14-245]<br><br>HONORABLE SPENCER G. SINGLETON, JUDGE<br><br><u>AFFIRMED ON DIRECT APPEAL AND ON CROSS-APPEAL. COURT OF APPEALS OPINION VACATED</u>. |

**BARBARA W. WEBB, Justice**

William B. Cherry (Cherry) appeals from a divorce decree that awarded his ex-wife, Rhonda Marlene Cherry, now Fulkroad (Fulkroad), permanent alimony, and a subsequent order that found him in contempt for failing to pay the full amount of alimony ordered. On appeal, Cherry argues that the circuit court erred (1) in calculating his monthly available resources to include amounts received annually or every five years; (2) in awarding alimony as a substitute for division of nonmarital property; (3) in holding him in contempt, calculating an arrearage, and imposing a fine for nonpayment; and (4) in finding no change of circumstances to support a reduction or elimination of the alimony award. Fulkroad has cross-appealed, arguing that the circuit court erred by (1) finding that the annuities from the personal-injury settlement were not marital property under Arkansas

Code Annotated section 9-12-315(B)(6) and (2) failing to order Cherry to purchase a life insurance policy or order Cherry not to replace her as the pay-on-death beneficiary of the two income annuities to effectively guarantee the income represented by the alimony award.

The court of appeals affirmed on appeal and on cross-appeal. *See Cherry v. Cherry*, 2020 Ark. App. 294, 603 S.W.3d 585. We granted Cherry's petition for review. When we review a decision by the court of appeals, we treat the case as though it had been originally filed in this court. *Brookshire Grocery Co. v. Morgan*, 2018 Ark. 62, 539 S.W.3d 574. We vacate the court of appeals opinion and affirm on direct appeal and on cross-appeal.

We note from the outset that this case comes before us with an unusual procedural history. Fulkroad petitioned for divorce and Cherry filed a counterclaim for divorce. When the circuit court entered what it believed to be a final order granting Fulkroad's petition on February 3, 2016 (the 2016 order), it did not expressly dismiss Cherry's counterclaim. Cherry attempted to appeal the award of alimony, and Fulkroad cross-appealed. After the record was lodged, Cherry's attorney passed away before any briefs were filed. Cherry eventually retained new appellate counsel and filed a motion seeking dismissal of both appeals without prejudice. The court of appeals granted the motion. *Cherry v. Cherry*, 2017 Ark. App. 245. Accordingly, we treat the order entered on December 31, 2018 (the 2018 order), as the final order in this case.

I. *Facts*

2

The parties married, divorced, and remarried on September 20, 1990. Fulkroad was twenty years old when she married. She had only a seventh-grade education and no work experience. During the lengthy marriage, Fulkroad did not work outside the home, although she did help with Cherry's trucking business––he was the owner/operator of a tractor-trailer rig. She also home-schooled their two children and cared for Cherry's ailing mother. Fulkroad paid the bills and handled dispatching while Cherry was on the road. Even though Cherry grossed approximately $100,000 per year from the trucking business, the family netted only $16,000–$18,000 annually.

On March 30, 2006, the cab of the truck that Cherry was driving was hit broadside by another tractor-trailer rig. Cherry was severely injured. His injuries included a left-eye laceration, a closed-head injury, rib fractures, left fibula fracture, left clavicle fracture, and severe trauma to his spine including fractures to thoracic vertebrae. As a result of these injuries, Cherry was totally and permanently disabled.

In 2009, Cherry received substantial financial compensation as a result of the accident. His structured settlement, which totaled some four million dollars, consisted of three annuities with regular distributions that were to be paid at regular intervals until 2033. The first was designated as a Medicare set-aside fund. The annuity contract acknowledged that Cherry was enrolled in Medicare, but projected obligations of $394,861.81 for future medical expenses, including $323,516.50 for future prescription-drug treatment. Although the annuity provided $11,602.75 per year, the money had to be segregated to protect Medicare's future claims. The two other annuities were unrestricted

and provided monthly payments of $2903.00 and $2950.86, respectively, and lump-sum payments every five years beginning in 2013. Each of these two annuities provided for payments of $25,000 in 2013, $50,000 in the years 2018, 2023, and 2028, and $100,000 in 2033. In addition, because Cherry was totally disabled, he receives $810 per month in Social Security benefits.

During the marriage, the parties used Cherry's annuity distributions, including the lump-sum distribution in 2013, as income. Additionally, they used the money to purchase an eighty-three-acre cattle farm, which became the marital residence, a scrap metal business, and equipment for these businesses. Neither the cattle farm nor the scrap yard succeeded; Cherry attributed the lack of success to his inability to perform manual labor which necessitated the hiring of help. Despite the infusion of cash from the structured settlement, it is undisputed that the parties' checking account was often overdrawn.

The parties separated in October 2014. Fulkroad moved in with an adult daughter. On December 23, 2014, Fulkroad filed for divorce, alleging general indignities. Cherry counterclaimed for divorce, also alleging general indignities. Fulkroad was subsequently granted temporary support in the amount of $1600 per month. Cherry voluntarily added an additional $200 to assist his daughter. By agreement, the parties divided the tangible marital property, including the real estate. Therefore, the only point of contention was how to handle Cherry's structured settlement. Fulkroad conceded that the Medicare set-aside annuity

4

was not marital property,[1] but asked that the other annuities be treated as marital property and divided accordingly. Cherry prayed that the be completely excluded. Fulkroad also asked that the annuities be considered as income for the purpose of alimony.

Prior to the 2016 order, Fulkroad testified about her limited education and work history. She claimed she had completed an online G.E.D. course, although she had not received a certificate. At the time of the hearing, her employment consisted of "sitting" with an elderly couple for $100-$125 per week. She also noted that she has some arthritis that causes her discomfort in the wintertime, but otherwise, she is able-bodied. She conceded that she had not made a concerted effort to find more gainful employment. As noted previously, after leaving Cherry, Fulkroad moved in with her adult daughter. However, she estimated that her expenses would be $3346 per month if she were to live alone.

Cherry claimed that the $810 he received from Social Security disability was his only income. Nonetheless, evidence of what his annuities paid was introduced. Cherry claimed that his monthly expenses totaled $3924, which included a $1200 payment on the marital residence.

The 2016 order stated that the annuities and social security payments were excluded from marital property by Arkansas Code Annotated section 9-12-315. However, the circuit court found that the annuities, including a prorated share of the pending five-year

---

[1]The Medicare set-aside annuity was created in accordance with 42 CFR 411.46 and 411.47 to accommodate potential Medicare liens resulting from Cherry's medical expenses.

distributions, gave Cherry a monthly income of "approximately $9,600.00." Accordingly, he awarded Fulkroad $2750 in permanent alimony.

As noted previously, the parties attempted to appeal the 2016 order. After remand, Fulkroad filed a motion for contempt, asserting that while Cherry continued to pay her $1800- per-month alimony, he never paid the full $2750 per month required by the 2016 order. Cherry asked the circuit court to reconsider the alimony award in based on Fulkroad's current needs.

At the November 7, 2018 hearing, Fulkroad testified that she had secured employment with the City of Stevens. Her monthly take-home pay, before the deduction for health insurance, was $1521.87. Further, she stated that she had taken the money she realized from the sale of the marital home and purchased a new residence outright. Her affidavit of financial means reflected monthly expenses of $3301.54, although Fulkroad acknowledged that she now had her adult daughter and grandchild, as well as a college student from Southern Arkansas University, living in her home.

Cherry testified that he had noncovered medical expenses of $4390.22 and had already exhausted his annual Medicare set-aside payment. He submitted an affidavit of financial means that reflected monthly expenses of $4423.60, not including the alimony that he was obligated to pay. According to Cherry, he now received only $804 in Social Security benefits. Cherry was questioned about what he had done with the 2018 lump-sum distribution. He stated that although he had purchased a mobile home and an RV, he was currently living at his brother's residence. He explained that his girlfriend at the time who

made the purchases on his behalf had titled them in her name. His affidavit further stated that he had only $508.02 cash on hand, and debts of $64,275.85, that required a monthly payment of $1519.77. In the 2018 order, the circuit court found Cherry in contempt and ordered him to pay $44,850 within thirty days. It further ordered that if the judgment was not satisfied within thirty days, it would fine Cherry $50 per day until it was paid in full. It denied Fulkroad's request to order Cherry to purchase a life insurance policy to secure the payment of alimony or make her a designated beneficiary on one of the annuities in the event of Cherry's demise. Finally, the circuit court denied Cherry's request to reduce the amount of his alimony obligation and "adopted in full" the prior order's "legal and factual basis for the award of alimony."

Cherry timely filed a notice of appeal, and Fulkroad cross-appealed.

## II. *Standard of Review*

On appeal, this court reviews domestic-relations cases de novo. *Artman v. Hoy*, 370 Ark. 131, 257 S.W.3d 864 (2007). However, we will not reverse the circuit court's finding of fact unless it is clearly erroneous. *Id*. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. *Id*. An award of alimony is within the sound discretion of the circuit court, and we will not reverse that decision absent an abuse of discretion. *Foster v. Foster*, 2016 Ark. 456, 506 S.W.3d 808.

## III. *Direct Appeal of the Alimony Award*

Although listed as three separate points, we take Cherry's first, second, and fourth points together and treat them as one single argument, much as Cherry does in his supplemental brief. He argues that the primary issue from which all others flow is whether the circuit court erred in ordering him to pay permanent alimony in the amount of $2,750 per month based on a calculation of income of "approximately $9,600.00" per month. Cherry asserts that the circuit court erred in averaging the five-year distributions from his annuities, which overstates the money he has on hand to provide support for his ex-wife. He contends that the undisputed record shows his "monthly available resources" are only $6,679.86. He notes that this money comes from a personal-injury settlement, which the circuit court correctly found was not subject to division as marital property.

Regarding the circuit court's methodology in capturing future lump-sum distributions from his annuities, Cherry acknowledges that in *Taylor v. Taylor*, 369 Ark. 31, 40, 250 S.W.3d 232, 239 (2007), this court allowed averaging to determine a payor's income. However, he asserts that averaging was only employed in circumstances where income varied week to week or month to month in order to get a "truer picture" of a person's income. Nonetheless, he states that we have never endorsed an averaging approach to capture future payments as current income when there is no variance. He contends that including amounts that the payor will not receive for years in the future does not determine current expendable income. Cherry argues that the circuit court likewise erred in finding the amount of Fulkroad's financial needs. After the 2016 order was entered, Fulkroad obtained full-time employment. In light of her current employment, Cherry

8

asserts that the alimony award now gives Fulkroad $970.33 more than her current needs of $3,301.54 per month, which she testified included having her daughter, granddaughter, and a college student live with her, and charitable giving of $200 per month. As a result of the obligation to pay alimony, Cherry contends that he now has less than his stated needs while Fulkroad has more. Cherry's argument is not persuasive.

The purpose of alimony is to rectify the economic imbalances in earning power and standard of living in light of the particular facts in each case. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, 593 S.W.3d 467. The primary factors to be considered in determining whether to award alimony are the financial need of one spouse and the other spouse's ability to pay. *Id.* The circuit court should also consider other secondary factors: (1) the financial circumstances of both parties; (2) the couple's past standard of living; (3) the value of jointly owned property; (4) the amount and nature of the parties' income, both current and anticipated; (5) the extent and nature of the resources and assets of each of the parties; (6) the amount of income of each that is spendable; (7) the earning ability and capacity of each party; (8) the property awarded or given to one of the parties, either by the court or the other party; (9) the disposition made of the homestead or jointly owned property; (10) the condition of health and medical needs of both husband and wife; (11) the duration of the marriage; and (12) the amount of child support. *Id.*

We note first that the circuit court did not clearly err when it found no reason to reassess the amount of alimony awarded in the 2016 order. We have said that the amount of alimony should not be reduced to a mathematical formula because the need for

9

flexibility outweighs the need for relative certainty. *Kuchmas v. Kuchmas*, 368 Ark. 43, 243 S.W.3d 270 (2006). Fulkroad's employment situation had improved shortly after the 2016 order was entered, but it was not so great as to make alimony unnecessary. Moreover, the monthly expenses that she had predicted in her 2016 affidavit were essentially the same in 2018. Furthermore, the division of marital property, while considerable, was fully contemplated by the 2016 order. We have held that the division of marital property and an award of alimony are complementary devices that a circuit court may employ to make the dissolution of a marriage as equitable as possible. *Id.*

We also reject Cherry's contention that the circuit court overstated his available financial resources. While the distributions from the Medicare set-aside annuity did not constitute income that was available to support Fulkroad, the other annuities did provide Cherry with a substantial ability to pay. These annuities, including the lump-sum distributions were used by the parties as income prior to their separation. Furthermore, at the time that the 2018 order was entered, Cherry had received a lump-sum distribution that he could have used to pay for alimony over the next five years. Further, we find no error in the circuit court's decision to prorate future lump-sum distributions in its calculation of the amount of financial resources that Cherry had available to pay alimony. The money was guaranteed, and the distributions were made at predictable intervals. Furthermore, there was a lump-sum distribution in 2018 that Cherry could have used to meet his court-ordered obligations. Finally, previously- referred-to "secondary factors" weigh in favor of granting alimony to Fulkroad. The marriage was of long duration, and although

Fulkroad is only in her forties, her employment prospects are not very good. While she did receive a substantial amount of cash from the sale of the marital assets, it was not sufficient to meet her reasonable expenses. Unquestionably, Cherry's annuities are significant assets that, over time, will likely far exceed the material assets that Fulkroad will likely amass. Regarding the remaining factors, we acknowledge that Fulkroad has the capacity to earn income, while Cherry is permanently and totally disabled. Given her lack of formal education and limited work history, however, the nature of her employment will likely not greatly improve. We are likewise mindful that Fulkroad's health is much better than Cherry's, and Cherry's medical needs are much greater. However, given the foregoing facts, we cannot say that the circuit court abused its discretion by not reducing or eliminating the amount of alimony that Fulkroad is to receive.

IV. *Direct Appeal of the Contempt Order*

We next consider Cherry's argument concerning the circuit court's finding of contempt. After remand from the court of appeals, Fulkroad filed a motion asking the circuit court to hold Cherry in contempt for failing to pay $2750 per month in alimony as required by the 2016 order. In pertinent part, Fulkroad testified at the contempt hearing that since October 1, 2015, she had been receiving monthly alimony payments from Cherry in the amount of $1,600 plus $200 because their daughter and granddaughter live with her. She further stated that she did not remember whether she had told him that she was "good with what he was paying" but admitted that they were "surviving on what he was paying." Cherry admitted that he knew he had been ordered to pay $2750 per month in alimony

and that he had failed to do so. Based on that testimony, the circuit court found that Cherry was paying only $1600 per month in alimony. The circuit court found the failure to pay willful and set the arrearage at $44,850 ($2,750 minus $1,600 times 39 months). Cherry was given thirty days from the entry of the order to pay the arrearage or he would be fined $50 per day until it was paid in full.

On appeal, Cherry asserts that the circuit court erred in finding him in contempt because he was financially unable to pay the full amount of alimony required by the 2016 order. Cherry claims that in September 2015 his monthly available resources were $6,679.86 ($826 + $2,903 + $2,950.86) to pay monthly expenses before alimony of $6,120 ($7,720 including the temporary alimony of $1,600). Cherry asserts that he "paid what he could, even though it meant going into debt to do so." Furthermore, he even increased his payment to Fulkroad, thinking that they had made an agreement when their adult daughter moved in with her. Cherry contends that Fulkroad should be estopped from claiming an arrearage after inducing him to make this agreement. Arguing further, he states that the circuit court erred in calculating any arrearage. He claims he should receive a $4400 credit for the months that he paid $1800.

Our standard of review for civil contempt is whether the finding of the circuit court is clearly against the preponderance of the evidence. *Gatlin v. Gatlin*, 306 Ark. 146, 811 S.W.2d 761 (1991). Refusal to obey any valid judgment, order, or decree of a court having jurisdiction to enter it may constitute contempt; a court has inherent power to punish that contempt. *Id.* Before a person may be held in contempt for violating a court order, that

12

order must be in definite terms as to the duties thereby imposed upon him, and the command must be expressed rather than implied. *Id.*

We hold that the circuit court did not clearly err in holding Cherry in contempt. The 2016 order was definite in its terms, and Cherry admitted that he was aware of the requirement to pay $2750 per month in alimony. We reject Cherry's assertion that he was financially unable to pay the alimony because it is undisputed that he received a lump-sum distribution from his annuities prior to the contempt hearing. While we are mindful that this was nonmarital property, this fact is of no moment; he did have the ability to pay. We affirm the finding of contempt.

## V. *Cross-Appeal*

Fulkroad first argues that the circuit court erred by finding that the annuities from the personal-injury settlement were not marital property under Arkansas Code Annotated section 9-12-315(b)(6). She asserts that section 9-12-315 defines "marital property" as "all property acquired by either spouse subsequent to the marriage." Furthermore, she asserts that there is a presumption that all property acquired during a marriage is marital property, and it is "undisputed" that the personal-injury settlement annuities were acquired during the marriage. Fulkroad concedes that the circuit court correctly excluded the "Medicare Set Aside Annuity" because it is dedicated to pay medical expenses, but the court should have found that the other annuities were marital property.

Fulkroad further asserts that damages in a personal-injury claim, such as those that Cherry maintained in this case, could include past reimbursement of the medical expenses

as well as his future medical expenses; past loss of income as well as future loss of income; pain, suffering, and mental anguish, past and future; property damage; scarring; loss of earning capacity; loss of consortium to a spouse; and punitive damages. She argues that only those portions of a personal-injury settlement dealing with disability or medical care are exempt, and the other elements of damages would therefore be required to be subject to division as marital property. Fulkroad contends that the circuit court wrongly excluded evidence of what made up the total damages that Cherry was compensated for but does not challenge any specific evidentiary ruling. Instead, she asserts that we should proceed from the fact that Cherry's monthly net earnings were only $1500 per month and his future medical expenses were covered by the Medicare set-aside annuity and find that the remainder was marital property. We disagree.

Fulkroad admits that she was unable to prove at trial that any payments from the annuities were for anything other than Cherry's personal-injury claim. This failure of proof cannot inure to her benefit on appeal. The plain wording of section 9-12-315(b)(6) expressly excludes "[b]enefits received or to be received from a workers' compensation claim, personal injury claim, or Social Security claim when those benefits are for any degree of permanent disability or future medical expenses." As noted previously, Cherry was found to be totally and permanently disabled. Accordingly, given the state of the record before us, we cannot hold that the circuit court clearly erred in finding that the annuities were not divisible as marital property.

14

Fulkroad next argues that the circuit court erred in failing to order Cherry to purchase a life-insurance policy or, alternatively, order Cherry not to replace her as the pay-on-death beneficiary of the income annuities "at least as to the amount of income as it relates to the alimony award."[2] At the time the parties separated, Fulkroad was the pay-on-death beneficiary for both annuities. These annuities guaranteed income for thirty years and are the basis of the alimony award. She acknowledges that Arkansas Code Annotated section 9-12-312(A)(2)(e) provides that "[u]nless otherwise ordered or agreed by the parties, the alimony shall automatically cease upon the death of either party." She contends that this presents her with a "dilemma" because, although income from the annuities is guaranteed through 2039, her alimony income will cease if Cherry dies prior to that date. Fulkroad argues further that this case presents the issue of whether alimony should stop upon the death of the person paying alimony if guaranteed income in the form of annuity payments continues after his death. She urges this court to focus on the language of the alimony statute that states, "Unless otherwise ordered by the Court, alimony ends at the death of a party." Without the order that was denied by the circuit court, Fulkroad states that she has "no future security and the purpose of awarding her alimony is frustrated." We reject this argument.

Fulkroad has not presented any compelling reason why the circuit court should have secured her alimony beyond the death of Cherry. As noted previously, she is able-

---

[2]Although Fulkroad's point on cross-appeal refers to both income annuities, keeping her as the pay-of-death beneficiary for a single annuity would more than cover the alimony award.

bodied and employed at a salary that is equal to what her entire family lived on prior to Cherry's accident. We cannot say that the circuit court erred in failing to grant her request.

Affirmed on direct appeal and on cross-appeal. Court of appeals opinion vacated.

KEMP, C.J., dissents without opinion on direct appeal and concurs without opinion on cross-appeal.

*Bell & Boyd, PLLC*, by: *Karen Talbot Gean*, for appellant.

*Crane, Phillips & Rainwater, PLLC*, by: *Steve R. Crane*, for appellee.